# United States Court of Appeals
## For the First Circuit

No. 20-1944

GASPEE PROJECT and ILLINOIS OPPORTUNITY PROJECT,

Plaintiffs, Appellants,

v.

DIANE C. MEDEROS, in her official capacity as member of the
Rhode Island State Board of Elections, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary S. McElroy, U.S. District Judge]

Before

Barron and Selya, Circuit Judges,
and Delgado-Hernández,* District Judge.

Daniel R. Suhr, with whom Jeffrey M. Schwab, Liberty Justice
Center, Joseph S. Larisa, Jr., and Larisa Law were on brief, for
appellants.
Katherine Connolly Sadeck, Special Assistant Attorney
General, with whom Peter F. Neronha, Attorney General of Rhode
Island, was on brief, for appellees.
Megan P. McAllen, Tara Malloy, Austin Graham, and Campaign
Legal Center on brief for Campaign Legal Center, Common Cause Rhode
Island, and League of Women Voters of Rhode Island, amici curiae.

* Of the District of Puerto Rico, sitting by designation.

---

September 14, 2021

---

      **SELYA**, <u>**Circuit Judge**</u>.  The Rhode Island General Assembly has enacted a comprehensive statutory scheme designed to increase transparency in regard to election-related spending.  The law requires limited disclosure of funding sources responsible for certain independent expenditures and electioneering communications (as defined).  The appellants — two organizations that fall within the statutory sweep — challenge particular disclosure and disclaimer provisions, positing that those provisions do not withstand the requisite degree of scrutiny and, in any event, that they infringe constitutionally protected privacy, associational, and free-speech rights.  The district court, in a comprehensive rescript, rejected the appellants' multifaceted facial challenge.  <u>See</u> <u>Gaspee Project</u> v. <u>Mederos</u>, 482 F. Supp. 3d 11, 13 (D.R.I. 2020).  After careful consideration, we affirm.

I

      We briefly rehearse the relevant facts and travel of the case.  The Rhode Island State Board of Elections is the state agency chiefly responsible for administering and enforcing the Independent Expenditures and Electioneering Communications Act (the Act).  <u>See</u> R.I. Gen. Laws § 17-25.3-4(b).  The plaintiffs (appellants here) are the Gaspee Project and the Illinois Opportunity Project.  Both entities are not-for-profit organizations that engage in issue advocacy related to matters of public policy.  They have sued the seven members of the Board of

Elections in their official capacities (and we henceforth refer to the defendants, collectively, as "the Board").

At a high level of generality, the appellants allege that various aspects of Rhode Island law compelling disclosure of the identities of certain donors and certain disclaimers transgress their rights under the First Amendment. See U.S. Const. amend. I. The regulatory scheme that they challenge came into effect in 2012, when the Rhode Island General Assembly passed the Act. See R.I. Gen. Laws § 17-25.3. This legislative initiative followed closely on the heels of a landmark Supreme Court decision that invalidated certain restrictions on corporations' independent expenditures while upholding various disclosure and disclaimer requirements imposed under federal law. See Citizens United v. FEC, 558 U.S. 310, 372 (2010).

The Act's disclosure and disclaimer requirements relate to persons or entities that spend $1,000 or more in any calendar year for either of two types of defined activities: "independent expenditures" or "electioneering communications." R.I. Gen. Laws § 17-25.3-1. Those disclosure requirements, though, are not absolute. They provide, for instance, that covered organizations need not disclose any donor who elects not to have his donation used in the funding of independent expenditures or electioneering communications. See id. § 17-25.3-1(i).

The Act defines an "independent expenditure" as an expenditure that, when taken in context, "expressly advocates the election or defeat of a clearly identified candidate, or the passage or defeat of a referendum."[1] Id. § 17-25-3(17). It exempts from the definition of independent expenditures, however, "news stor[ies], commentar[ies], or editorial[s]," "candidate debate[s] or forum[s]," or "communications made by any business entity to its members, owners, stockholders, or employees" as well as most "internet communications." Id. § 17-25-3(17)(i)(A)-(D). An "electioneering communication" is a communication that "unambiguously identifies a candidate or referendum" and which is made within sixty days of a general election or referendum or within thirty days of a primary election. Id. § 17-25-3(16).

The appellants challenge three requirements that the Act imposes on organizations (including the appellants) that cross the $1,000 threshold. First, they challenge the requirement that the organization must file a report with the Board disclosing all donors who contributed $1,000 or more to the organization's general fund if the general fund was used to finance qualifying expenditures. See id. § 17-25.3-1(h). Second, they challenge the requirement that covered organizations must register with the

---

[1] The Act incorporates definitions found in an earlier statute, namely, the Rhode Island Campaign Contributions and Expenditures Reporting Act, R.I. Gen. Laws § 17-25-3.

Board and furnish their names and mailing addresses. See id.
§ 17-25.3-1(f). Third, they challenge the requirement that
covered organizations must include their own names and list their
five largest donors from the previous year on the electioneering
communication itself (subject, however, to several exceptions).
See id. § 17-25.3-3. In all cases — regardless of whether it
appears in television, mail, radio, or internet advertising — the
list of donors is limited to those who are required to be disclosed
in such a report. See id. § 17-25.3-3(a), (c)(3), (d)(3)(A), (e).
And with respect to printed communications, the requirement does
not apply to news editorials, campaign paraphernalia (such as
campaign buttons and bumper stickers), or signage measuring under
thirty-two square feet. See id. § 17-25.3-3(b).

        Invoking 42 U.S.C. § 1983, the appellants repaired to
the United States District Court for the District of Rhode Island
and filed suit against the Board. In their amended complaint,
they sought a declaration that the challenged provisions violated
their privacy, associational, and free-speech rights under the
First Amendment. The amended complaint alleged — and we take as
true — that the appellants come within the purview of the Act
because they each intended to spend over $1,000 in connection with
"paid issue-advocacy communications" regarding the impact of local
referenda on property taxes. The appellants also alleged — and we

take as true — that these communications would not include any "express ballot-advocacy."

The Board moved to dismiss the amended complaint for failure to state a cognizable claim. See Fed. R. Civ. P. 12(b)(6). At a hearing held on July 21, 2020, the appellants represented that they were mounting only a facial challenge to the constitutionality of the Act. The district court reserved decision and later granted the motion to dismiss. See Gaspee, 482 F. Supp. 3d at 13. Applying exacting scrutiny, the court determined that the challenged provisions of the Act passed constitutional muster. See id. at 16-20. Pertinently, the court held that the Board's interest in an informed electorate with respect to the funding of political speech was sufficiently important to justify the challenged provisions of the Act. See id. at 17-18. It further held that those provisions were substantially related to that important governmental interest. See id. at 18-20. Finally, the court rejected the appellants' counter-arguments as to why, all else aside, the challenged provisions violated their privacy, associational, and/or free-speech rights. See id. at 20-22. This timely appeal followed.

## II

A matter of jurisdictional dimension demands our immediate attention. The dispute between the parties first surfaced in the context of the 2020 election cycle, which now has

run its course. Even though the parties have proceeded on the assumption that the dispute is still velivolant, we have an independent obligation to determine whether it is moot. See Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council, 589 F.3d 458, 467 (1st Cir. 2009).

A dispute is moot only "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Town of Portsmouth v. Lewis, 813 F.3d 54, 58 (1st Cir. 2016) (internal citation omitted). Withal, there is a well-established exception to the mootness doctrine for cases presenting issues that are "capable of repetition, yet evading review." Barr v. Galvin, 626 F.3d 99, 105 (1st Cir. 2010) (quoting S. Pac. Terminal Co. v. Interstate Com. Comm'n, 219 U.S. 498, 515 (1911)). Cases in the election context are not moot simply because the election is over, at least when the allegedly aggrieved parties are likely to be subject to the challenged regulation in the future. See FEC v. Wisc. Right to Life, Inc., 551 U.S. 449, 462 (2007); Barr, 626 F.3d at 106. That is the situation here: the Act is still on the books, and the appellants assert — without contradiction — that they plan to engage in similar advocacy during future election cycles. The dispute, therefore, is not moot. See Storer v. Brown, 415 U.S. 724, 737 n.8 (1974) (holding challenge to election regulation not moot despite election being "long over"

because regulation remained in effect and applied to "future elections").

## III

With the specter of mootness laid to rest, we review the district court's grant of the Board's motion to dismiss de novo. See Maloy v. Ballori-Lage, 744 F.3d 250, 252 (1st Cir. 2014); SEC v. Tambone, 597 F.3d 436, 441 (1st Cir. 2010) (en banc). "In the process, we accept as true all well-pleaded facts set out in the complaint and indulge all reasonable inferences in favor of the pleader." Tambone, 597 F.3d at 441.

The appellants argue that the challenged provisions of the Act cannot withstand the requisite degree of constitutional scrutiny. And even if they do, the appellants say, three additional lines of argument operate to invalidate the challenged provisions. The first such line of argument posits that the challenged provisions violate the appellants' right to engage anonymously in political speech. Their second line of argument posits that the challenged provisions violate their right to associational privacy. Their third line of argument posits that the Act's on-ad disclaimer requirement forces the appellants to engage in an unconstitutional species of compelled speech.

Our analysis proceeds in two main parts, each with subparts. First, we establish the appropriate level of constitutional scrutiny — here, exacting scrutiny — and then

explain why the Act survives that level of scrutiny.  We thereafter proceed to address the appellants' trio of counter-arguments.

## A

Regulations that burden political speech must typically withstand strict scrutiny.  See Citizens United, 558 U.S. at 340. This baseline rule applies to many aspects of election law.  See, e.g., id. at 339; Wis. Right to Life, 551 U.S. at 465-66.  Even so, disclosure and disclaimer regimes are cut from different cloth. See, e.g., Citizens United, 558 U.S. at 366; McConnell v. FEC, 540 U.S. 93, 201 (2003); Buckley v. Valeo, 424 U.S. 1, 75-76 (1976); Nat'l Org. for Marriage v. McKee (NOM), 649 F.3d 34, 55 (1st Cir. 2012); cf. Ams. for Prosp. Found. v. Bonta, 141 S. Ct. 2373, 2382-83 (2021) (explaining unique context of laws compelling disclosure).

This distinction arises because — unlike limits on election-related spending — election-related disclosure and disclaimer requirements "impose no ceiling on campaign-related activities." Citizens United, 558 U.S. at 366 (quoting Buckley 424 U.S. at 64).  Nor do they "prevent anyone from speaking." Id. (quoting McConnell, 540 U.S. at 201 (internal quotation marks and brackets omitted)).  Against this backdrop, the Supreme Court has described disclosure and disclaimer regimes, in the election-law context, as "less restrictive alternative[s] to more comprehensive regulations of speech." Id. at 369.

Given this taxonomy, it is unsurprising that such disclosure and disclaimer requirements are subject to a less intense standard of constitutional review. That standard bears the label of "exacting scrutiny." Id. at 366; NOM, 649 F.3d at 55; cf. Ams. for Prosp., 141 S. Ct. at 2883 (applying exacting scrutiny to disclosure laws outside the election context). Such a level of scrutiny has been infused in the Court's approach to disclosure and disclaimer regimes for decades. See Buckley, 424 U.S. at 64-65 (considering compelled disclosure of election-related spending).

To withstand exacting scrutiny, a law or regulation must be narrowly tailored to serve a sufficiently important governmental interest. See Ams. for Prosp., 141 S. Ct. at 2383. Prior to the Court's recent decision in Americans for Prosperity, exacting scrutiny was widely understood to require only a "substantial relation" between the challenged regulation and the governmental interest. NOM, 649 F.3d at 55. In refining its articulation of exacting scrutiny, the Americans for Prosperity Court heightened this requirement, emphasizing that "[i]n the First Amendment context, fit matters." 141 S. Ct. at 2384 (quoting McCutcheon v. FEC, 572 U.S. 185, 218 (2014)). The Court went on to say that exacting scrutiny "require[s] a fit that is not necessarily perfect, but reasonable." Id. (quoting McCutcheon, 572 U.S. at 218). A "[s]ubstantial relation is necessary but not

sufficient" for a challenged requirement to survive exacting scrutiny.  Id.  And in addition, "the challenged requirement must be narrowly tailored to the interest it promotes."  Id.

**1**

Before applying this more muscular test for exacting scrutiny, we first must resolve a threshold matter.  That matter concerns the import, if any, of the appellants' ipse dixit that express advocacy and issue advocacy trigger different degrees of scrutiny.  Specifically, the appellants argue that cases such as Buckley, McConnell, and Citizens United are inapposite because those cases deal primarily with express advocacy (that is, candidates and political action committees (PACs)), not with issue advocacy (that is, the mere conveying of information and education), which is the appellants' avowed stock and trade.

For present purposes, the distinction that the appellants draw does not make a difference.  In the election context, the Supreme Court has rejected the attempt to distinguish between express advocacy and issue advocacy when evaluating disclosure laws — even though the Court has deemed such a distinction relevant when evaluating limits on expenditures.  See Citizens United, 558 U.S. at 368-69.  This makes perfect sense. As we explained in NOM, the Court has cabined the application of limits on expenditures to express advocacy in part because it was concerned that such laws impermissibly regulated a substantial

amount of constitutionally protected speech.  See 649 F.3d at 54.
Unlike limits on expenditures (which place a brake on political
speech), disclosure regimes do not limit political speech at all.
A disclosure regime is, therefore, "a less restrictive alternative
to more comprehensive regulations of speech."  Citizens United,
558 U.S. at 369.

Seen in this light, there is no principled basis for us
to distinguish between express advocacy and issue advocacy with
respect to election-law disclosure regimes.  The distinction is
viable solely in the context of limits on independent expenditures,
see NOM, 649 F.3d at 54, and it is irrelevant in the
disclosure/disclaimer context.[2]  Our sister circuits have, with
conspicuous consistency, rejected the appellants' proposed
distinction, see, e.g., Del. Strong Fams. v. Denn, 793 F.3d 304,
308 (3d Cir. 2015); Human Life of Wash. Inc. v. Brumsickle, 624
F.3d 990, 1016 (9th Cir. 2010), and so do we.

---

[2] We take no view on the appellants' attempt to categorize
their mailings as nothing more than informational materials.
Although the appellants' proposed mailings do not expressly
advocate how voters should vote on the referenda to which they
refer, they identify the particular referenda and forecast the
negative consequences that will supposedly flow from certain
outcomes.  Communications such as these, which subtly advocate for
a position even though not including explicit directives on how to
vote, illustrate why federal courts regularly have spurned rigid
distinctions between express advocacy and issue advocacy in the
election-law disclosure context.

**2**

Having set the appellants' proposed distinction to one side, we turn to the question of whether the Board's proffered justification is sufficiently important to support the Act's disclosure and disclaimer regime.  See Ams. for Prosp., 141 S. Ct. at 2383.  To this end, the Board submits that its interest in promoting an informed electorate is adequate to support the Act's disclosure and disclaimer requirements.  The amici, whose insights we appreciate, echo this refrain.  The appellants rejoin that the Board's informational interest is weak and, thus, insufficient to justify the compelled disclosure and disclaimer regime.

The case law makes pellucid that the Board's interest in an informed electorate vis-à-vis the source of election-related spending is sufficiently important to support reasonable disclosure and disclaimer regulations.  See Buckley, 424 U.S. at 14-15 ("In a republic where the people are sovereign, the ability of the citizenry to make informed choices . . . is essential.").  The Buckley Court, for example, upheld disclosure requirements for independent expenditures.  See id. at 75-76.  It explained that "provid[ing] the electorate with information as to where political campaign money comes from," id. at 66 (internal quotations omitted), is sufficient to outweigh the possibility of infringement on First Amendment freedoms because it concerns "the free functioning of our national institutions," id. (quoting

Communist Party v. Subversive Activities Control Bd., 367 U.S. 1, 97 (1961)).

The Supreme Court built on this foundation when addressing challenges to the Bipartisan Campaign Reform Act (BCRA). See Pub. L. No. 107-155 (2002). The McConnell Court accepted the informational interest articulated in Buckley as sufficiently important to justify a new set of disclosure requirements encompassed within Title II of the BCRA. See 540 U.S. at 196. It concluded that Buckley "foreclose[d] a facial attack" on the BCRA's requirement that entities meeting a spending threshold on electioneering communications must disclose a certain subset of donors.[3] Id. at 197.

In Citizens United, the Supreme Court reaffirmed its view that the government's interest in an informed electorate is sufficient to justify reasonable disclosure and disclaimer provisions. See 558 U.S. at 368-69. There, the Court considered (among other things) challenges to the BCRA's disclosure and disclaimer requirements as applied both to a film attacking a

---

[3] The McConnell Court's conclusion was reached with respect to section 201 of the BCRA, which amended the law considered in Buckley. Section 201 requires a corporation or labor union that spends $10,000 or more on qualifying communications to file a disclosure identifying any donors of $1,000 or more. See Pub. L. No. 107-155, § 201. There is a marked similarity between section 201 of the BCRA and the Rhode Island regulations that are challenged here: the Act requires a comparable disclosure if the covered organization spends $1,000 or more on qualifying communications. See R.I. Gen. Laws § 17-25.3-1(h).

presidential candidate and to advertisements for that film. <u>See</u> <u>id.</u>  Citing <u>Buckley</u> and <u>McConnell</u>, the Court reiterated the value of an electorate with knowledge about those responsible for speech during the period shortly before an election. <u>See</u> <u>id.</u> at 369.

    The law in this circuit is of a piece with the Supreme Court's approach.  In <u>NOM</u>, we held that Maine's interest in an informed electorate was sufficiently important to justify reasonable disclosure and disclaimer requirements.[4]  <u>See</u> 649 F.3d at 56-58.  We added that the government's interest in an informed electorate extends beyond the dissemination of information concerning candidates for office.  <u>See</u> <u>id.</u> at 57.  Rather, "there is an equally compelling interest in identifying the speakers behind politically oriented messages."  <u>Id.</u>  This is especially true in the age of new media, given the proliferation of speakers in the marketplace of ideas.  <u>See</u> <u>id.</u>  Consequently, reasonable disclosure regimes "enable[] the electorate to make informed decisions and give proper weight to different speakers and messages."  <u>Citizens United</u>, 558 U.S. at 371.

    Justice Brandeis famously observed that "public discussion is a political duty."  <u>Whitney</u> v. <u>California</u>, 274 U.S.

---

    [4] On the same day, we upheld the constitutionality of Rhode Island's previous campaign finance scheme.  <u>See</u> <u>Nat'l Org. for Marriage</u> v. <u>Daluz</u>, 654 F.3d 115, 116 (1st Cir. 2011).  We found that Rhode Island's interest in an informed electorate was sufficient to justify a disclosure and disclaimer regime.  <u>See</u> <u>id.</u> at 118.

357, 375-76 (Brandeis, J., concurring).  Through the "discovery
and spread of political truth," public discussion allows us to
apply our "power of reason."  Id.  The failure to uphold that duty
in the sphere of elections would be most devasting to our
democracy.  And yet, in this setting, the public faces an uphill
battle of identifying whether and how money is talking.  Given
these concerns, we hold that Rhode Island's interest in an informed
electorate is sufficiently important to satisfy the first
imperative of exacting scrutiny.  And with this holding in place,
we turn to the Act's specific requirements.

**3**

The next question is whether the Act's disclosure and
disclaimer requirements are narrowly tailored to the Board's
informational interest.  See Ams. for Prosp., 141 S. Ct. at 2383.
Those requirements need not reflect the least restrictive means
available to achieve the Board's goals, but they need to achieve
a reasonable fit.  See id. at 2384.  Here, the appellants train
their fire on three provisions of the Act:  the requirement that
covered organizations disclose donors of over $1,000; the
requirement that covered organizations disclose their own identity
to the Board; and the requirement that covered organizations
identify themselves and their five largest donors on certain
electioneering communications.  As we explain below, we think that

both the disclosure and disclaimer requirements are narrowly tailored to further the Board's interest in an informed electorate.

We start with the first two challenged provisions, which require certain organizations to disclose particular information to the Board. The provisions of the Act (including the disclosure and disclaimer requirements) apply only to organizations that satisfy a series of criteria. The first criterion is a spending threshold: the Act applies if an organization spends $1,000 or more on independent expenditures or electioneering communications within one calendar year. See R.I. Gen. Laws § 17-25.3-1(b). The Supreme Court upheld similar disclosure requirements in Citizens United, focusing on the close relationship between the requirements and the public's interest in knowing who is speaking as an election approached. See 558 U.S. at 369. Consistent with this focus, the spending threshold tailors the Act to reach only larger spenders in the election arena and at the same time shapes the Act's coverage to capture organizations involved in election-related spending as opposed to those engaged in more general political speech. With respect to covered organizations, this spending threshold helps to ensure that the electorate can understand who is speaking and, thus, to "give proper weight to different speakers and messages" when deciding how to vote. Id. at 371.

In addition to the spending threshold, the Act contains temporal limitations that tether the Act's disclosure requirements to the Board's informational interest.  The fact that the Act only applies when an organization crosses the spending threshold and spends that money in a particular time frame — within one year of an election for independent expenditures and, for electioneering communications, within either thirty or sixty days of an election (depending on the type) — links the challenged requirements neatly to the Board's objective of securing an informed electorate.  See Nat'l Ass'n for Gun Rights, Inc. v. Mangan, 933 F.3d 1102, 1118 (9th Cir. 2019); Del. Strong Fams., 793 F.3d at 311; Vt. Right to Life Comm., Inc. v. Sorrell, 758 F.3d 118, 134 (2d Cir. 2014). The Act's time frames for disclosure are no longer than either those in the Maine statute discussed in NOM, see 649 F.3d at 42-43, or those in the BCRA, see Citizens United, 558 U.S. at 366-67 (describing BCRA § 201, currently codified at 52 U.S.C. § 30104).

The Act is narrowed further by another aspect of the way in which it defines "electioneering communication."  Such a communication must be "targeted to the relevant electorate."  R.I. Gen. Laws § 17-25-3(16).  An electioneering communication satisfies this targeting requirement only if it "can be received by two thousand . . . or more persons in the district the candidate seeks to represent or the constituency voting on the referendum." See id.  This limitation further ties the Act's coverage (in the

case of electioneering communications) to the Board's informational interest by requiring disclosure only when the relevant electorate receives the communication. Notwithstanding the Act's other requirements, covered organizations are free to speak without disclosure when addressing audiences disconnected from the upcoming election.

The appellants make much of the fact that the Act's disclosure and disclaimer provisions apply to general funds, even though other regimes (such as the BCRA) require that organizations subject to disclosure requirements establish segregated bank accounts to avoid disclosure of individual names. See 52 U.S.C. § 30104(f)(2)(E)-(F). The application of the Act to general funds is problematic, the appellants suggest, because many general-fund donors may not endorse all of an organization's election-related expenditures. This suggestion, though, fails to take into account the fact that — unlike the BCRA — the Act provides ample opportunity for donors to opt out from having their donations used for independent expenditures or electioneering communications, even if the entity to which they contribute has not created a segregated fund.

Importantly, the Act provides off-ramps for individuals who wish to engage in some form of political speech but prefer to avoid attribution. To begin, such an individual may choose to contribute less than $1,000; covered organizations need only

disclose donors who contribute $1,000 or more during the relevant time frame.  See R.I. Gen. Laws § 17-25.3-1(h).  This readily available means of avoiding disclosure punches a sizable hole in the appellants' insistence that the Act's disclosure requirements are tantamount to the compelled disclosure of membership lists. Nor does the Act require disclosure of individuals who meet the $1,000 threshold but opt out of having their monies used for independent expenditures or electioneering communications.  See id. § 17-25.3-1(i).

Taken together, these limitations on the Act's reach only require disclosure of relatively large donors who choose to engage in election-related speech.  The Act simply does not apply to others, including those who engage in political speech outside the election context.  Given this circumscription and given the continuing force of the Court's rulings in Citizens United and our rulings in NOM, the challenged provisions are narrowly tailored to enable "the citizenry to make informed choices" at the polls about issues of public import.  Buckley, 424 U.S. at 14-15.  Indeed, Rhode Island's $1,000 trigger point for disclosure of donors is higher than the trigger point upheld in NOM for reporting PAC contributors.  See NOM, 649 F.3d at 42 ("A major-purpose PAC must report any contribution to the PAC of more than $50 (including the name, address, occupation, and place of business of the contributor).").  It is also no lower than the contributor trigger

point upheld in <u>Citizens United</u>.  <u>See</u> <u>Citizens United</u>, 558 U.S. at
366-67; 52 U.S.C. § 30104(f)(2) (providing that a disclosure
statement identify contributors who "contributed an aggregate
amount of $1,000 or more").

In view of the number of criteria that an organization
must satisfy before being required to file, the appellants' claim
that the Act's disclosure requirements are "expansive" is an
exercise in hyperbole.  Both the circumscribed scope of the Act's
requirements and the rather modest quantity of information
demanded by the Board argue to the contrary.  In combination, these
facts bolster our conclusion that the Act's disclosure
requirements are narrowly tailored enough to avoid any First
Amendment infirmity.  We uphold those requirements against the
appellants' facial challenge.

**4**

This brings us to the appellants' remonstrance
concerning the Act's on-ad disclaimer requirement.  <u>See</u> R.I. Gen.
Laws § 17-25.3-3.  The Act's spending and temporal thresholds
coalesce to render the disclaimer requirement applicable in only
a limited set of circumstances.  That set of circumstances shrinks
even further in view of the fact that donors need not be listed if
they have opted out of election-related spending.  <u>See</u>, <u>e.g.</u>, <u>id.</u>
§ 17-25.3-3(a).

Disclaimer requirements are reviewed under exacting scrutiny (not strict scrutiny, as the appellants assert). See Citizens United, 558 U.S. at 368. In NOM, we upheld aspects of Maine's campaign finance law, including an on-ad disclaimer requirement that bore a family resemblance to the requirement challenged here. See NOM, 649 F.3d at 58-61. The Maine law demanded that a communication identify the "person who made or financed the expenditure for the communication." See Me. Rev. Stat. Ann. tit. 21-A, § 1014(1)-(2). The Act goes a step further; it demands not only identification of the funding organization itself but also identification of its five largest donors. See R.I. Gen. Laws § 17-25.3-3. Put another way, the Act requires that the on-ad disclaimer both disclose the relevant speaker and some donors to that speaker.

Although the NOM Court was not obliged to apply a narrow-tailoring test to requirements like the ones before us, we nonetheless find that court's reasoning instructive. Here, as in Maine, the Act's disclaimer requirement has "a close relation to [the Board's] interest in dissemination of information regarding the financing of political messages." NOM, 649 F.3d at 58-61.

To be sure, the appellants labor to distinguish NOM and consign it to the scrap heap. The distinctions upon which the appellants rely, however, cannot carry the weight that the

appellants pile upon them.  We explain briefly and then turn
directly to the top-five-donor mandate.

At the outset, the appellants point out that the
plaintiffs in NOM advanced only vagueness and overbreadth
challenges.  That is true as far as it goes — but it does not take
the appellants very far.  Because the NOM court applied exacting
scrutiny to analogous election-law requirements, some of its
reasoning can usefully be transplanted to the case at hand.

The appellants next note that the Maine statute has an
"escape hatch" for avoiding the state's disclosure and disclaimer
requirements, whereas the Act contains none.  Placing reliance on
this distinction, though, is too much of a stretch.  The "escape
hatch" to which the appellants allude — which, at any rate, was
not deemed essential by the NOM court — is a provision in the Maine
statute that allows for a hearing to rebut a presumption of
applicability.  See id. at 49.  Rhode Island law offers a
functionally equivalent mechanism:  it allows a party to seek an
advisory opinion from the Board regarding the Act's applicability
to a communication.  See R.I. Gen. Laws § 17-25-5(c)(1).  Though
not identical, any discrepancy between these approaches does not
throw shade on the persuasive reasoning of NOM.

The appellants also note that Maine's law — unlike the
Act — applies only to communications concerning candidates'
elections rather than referenda and suggest that the government's

interest in regulating the latter is weaker.  But there is nothing in NOM that indicates that we predicated our decision on the Maine statute's exclusive focus on candidates.  The well-established interest articulated in NOM pertains to the ability of "the electorate to make informed decisions and give proper weight to different speakers and messages."  649 F.3d at 57 (quoting Citizens United, 558 U.S. at 371).  This interest applies to the passage of referenda in the same way in which it applies to the election of candidates.  And in the last analysis, disclaimer requirements — like the requirement challenged here — help to ensure a well-informed electorate by preventing those who advocate for either candidates or issues from hiding their identities from the gaze of the public.  See McConnell, 540 U.S. at 198.

This brings us to the appellants' contention that the requirement to identify in a disclaimer the top five donors to the entity that places the advertisement cannot withstand exacting scrutiny.  Such a requirement, the appellants assert, serves no informational interest and is essentially redundant of the disclosure requirement.  We are not persuaded.

There is plainly an informational interest served by an on-ad disclaimer that identifies some of the speaker's donors, as both Citizens United and NOM recognized in upholding disclosure requirements for equivalent funders.  The on-ad donor disclaimer, moreover, is not entirely redundant to the donor information

revealed by public disclosures. The appellants cannot plausibly dispute that on-ad donor information is a more efficient tool for a member of the public who wishes to know the identity of the donors backing the speaker. As we have explained, "[c]itizens rely ever more on a message's source as a proxy for reliability and a barometer of political spin." NOM, 649 F.3d at 57. And even though citizens have become reliant on such cues, they may be too easily overlooked or obscured. The public is "flooded with a profusion of information and political messages," id., and the on-ad donor disclaimer provides an instantaneous heuristic by which to evaluate generic or uninformative speaker names.

And even beyond increased efficiency, the form of disclosure — an on-ad disclaimer — may be more effective in generating discourse that facilitates the ability of the public to make informed choices in the specialized electoral context. The donor disclosure alerts viewers that the speaker has donors and, thus, may elicit debate as to both the extent of donor influence on the message and the extent to which the top five donors are representative of the speaker's donor base — questions that the appellants seem to think the citizenry too dull to ask. Citizens United gives us reason to believe that the appellants' view is myopic. There, the Court recognized that the disclaimers at issue were intended to "insure that the voters are fully informed," 558 U.S. at 368 (quoting Buckley, 424 U.S. at 76), and it nowhere

indicated that the state interest in "provid[ing] the electorate with information" has force only when such disclaimers can be said to facilitate disclosure requirements, id. (quoting McConnell, 540 U.S. at 196).

The appellants also contend that the on-ad donor disclaimer furnishes potentially irrelevant information while unduly burdening their speech.  But even though the degree of relevancy may vary, the identification of top donors is relevant in all cases.  To illustrate this point, we take one of the appellants' proffered hypotheticals.  A top-five-donor disclaimer may be less helpful than a top-six-donor disclaimer, if an entity's sixth-largest donor is somehow directly connected to the advertisement.  But this line-drawing exercise — which asks, at bottom, whether to mandate a list of five top donors or some greater or lesser number — is a task best left to the legislature. Cf. Buckley, 424 U.S. at 83 (observing that the level at which to set monetary thresholds for reporting and disclosure is "necessarily a judgmental decision, best left . . . to congressional discretion").  What matters is that the disclaimer includes a limited set of data points, readily available to the speaker, that is directly tied to educating voters on the message's source.

Additionally, the appellants say that they worry that the top-five-donor list might mislead a viewer either as to the

makeup of a speaker's contributor base or as to a donor's endorsement of the message. They also worry that the donor list could elicit threats or harassment. But the on-ad donor disclaimer is subject to the same off-ramps that apply to the disclosure requirement. See, e.g., R.I. Gen. Laws § 17-25.3-3(a) ("[N]o donor shall be listed who is not required to be disclosed in a report to the board of elections by the person, business entity, or political action committee."). These off-ramps serve to mitigate the appellants' stated concerns, which do not necessarily arise in all cases, and ensure the disclaimer provision is narrowly tailored. An organization could, of course, raise any concerns particular to its circumstances by means of an as-applied challenge.

We cut to the chase. In the election-related context, it is clear beyond hope of contradiction that the state can require speakers to self-identify through disclosures and disclaimers. Beyond self-identification, though, the state does not have limitless power to require more from a speaker, such as identification of its donors. Our task today, however, does not involve setting the outer constitutional bounds of what a state might demand in terms of election-related disclaimers. It suffices to say that Rhode Island's disclaimer requirement, including its top-five-donor provision, survives exacting scrutiny when faced with a facial challenge.

In a Rumpelstiltskin-like effort to turn dross into gold, the appellants beseech us to consider the potential effects that the Act — and particularly, its disclaimer requirement — will have on their own organizations and memberships. We are aware that the Supreme Court has left open the possibility of as-applied challenges to disclosure and disclaimer requirements if a threat of retaliation looms. See Citizens United, 558 U.S. at 370; McConnell, 540 U.S. at 98. To mount this type of challenge, though, a party must show "a reasonable probability that the compelled disclosure . . . will subject [donors] to threats, harassment, or reprisals." Buckley, 424 U.S. at 74.

The appellants' amended complaint is bereft of any such factual allegations. And to cinch the matter, the appellants concede that they have mounted only a facial challenge to the Act. Generally speaking, facial challenges leave no room for particularized considerations and must fail as long as the challenged regulation has any legitimate application. See Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008); Hightower v. City of Bos., 693 F.3d 61, 77-78 (1st Cir. 2012). That is the case here: the appellants have wholly failed to demonstrate that the alleged lack of tailoring is "categorical" and present in every application of the challenged requirements. Ams. for Prosp., 141 S. Ct. at 2387. There is no "dramatic

mismatch . . . between the interest that [Rhode Island] seeks to promote and the [disclosure and disclaimer] regime that [it] has implemented in service of that end." Id. at 2386. It bears emphasis that the disclaimer requirement, for example, applies to a small number of donors, based on a reasonable assessment of their likely roles in financing the particular electioneering communication. And it does so predicated on a sensible concern that — without this information being readily accessible — "independent groups [could run] election-related advertisements 'while hiding behind dubious and misleading names.'" Citizens United, 558 U.S. at 367 (quoting McConnell, 540 U.S. at 197).

Nor is it evident on this record that "a substantial number of [the Act's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." Ams. for Prosp., 141 S. Ct. at 2387 (quoting United States v. Stevens, 559 U.S. 460, 473 (2010)). Indeed, the parties have made it evident, both before the district court and in their briefs on appeal, that they do not contend that the Act is overbroad. See Gaspee, 482 F. Supp. 3d at 19. Needless to say, any individual challenges, including those alleging that the requirements impose an unusual burden in particular circumstances (such as a chilling effect on speech resulting from harassment), may be brought in the form of as-applied challenges.

**B**

The appellants attempt to move the goalposts. They say that even if the challenged provisions of the Act withstand exacting scrutiny, we should still strike down those provisions on other grounds. To this end, they offer three counter-arguments as to why the challenged provisions infringe their First Amendment rights. We turn next to these counter-arguments.

**1**

The appellants argue that the Act's disclosure and disclaimer requirements transgress the First Amendment's protection of anonymous political speech. Their argument relies primarily on the Supreme Court's decision in McIntyre v. Ohio Elections Commission, 514 U.S. 334 (1995). In that case, the Court invalidated a blanket ban on anonymous campaign literature under which an individual pamphleteer had been charged, convicted, and fined. See id. at 357.

The threshold question is whether the Court's later decision in Citizens United pretermits this argument. Although the Citizens United Court did not directly address McIntyre, the appellants in Citizens United made a McIntyre-based argument in their brief. See Citizens United, Appellants' Br. at 44. The fact that the Court did not adopt the McIntyre framework in the election-law context speaks eloquently to its inapplicability.

The Ohio statute at issue in McIntyre constituted an outright ban on anonymous literature. See 514 U.S. at 336. That is at a considerable remove from a disclosure requirement in the election-law context. We deem this to be a dispositive difference because — in contrast to the broad sweep of the Ohio statute — the Act's disclosure regime applies only to a small subset of campaign finance spending. See Worley v. Fla. Sec. of State, 717 F.3d 1238, 1247 (11th Cir. 2013) (finding McIntyre inapplicable for similar reasons).

Indeed, the McIntyre Court itself distinguished between election-related disclosures and political pamphlets, emphasizing the more robust interest in protecting the latter. See 514 U.S. at 355. In the Court's words, mandatory campaign finance disclosures are "a far cry from compelled self-identification on all election related writings." Id. Money, the Court wrote, is "less specific, less personal, and less provocative than a handbill." Id. Given these salient differences, we conclude that the appellants' McIntyre-based "speaker privacy" argument lacks force.

## 2

The appellants next strive to draw an analogy between the Act's disclosure requirements and the compelled disclosure of membership lists invalidated by the Court in NAACP v. Alabama, ex

rel. Patterson, 357 U.S. 449 (1958). This analogy does not hold water.

In NAACP, the Court was confronted with a challenge to a state court order requiring disclosure of the NAACP's membership rolls to the Alabama state attorney general. See id. at 451. The state's asserted interest in the membership information was to address business registration fraud, see id. at 464, but the proof revealed that the state was motivated by a desire to drive out the organization and its racial integration efforts during the Jim Crow era. The Court rejected the state's bid. See id.

In contrast, the challenge mounted by the appellants is a purely facial challenge to a disclosure regime designed to increase transparency with respect to election-related spending. As Citizens United and NOM evince, the election-law context is a breed apart, implicating the government's substantial interest in transparent elections — the bedrock of our democracy.

If more is needed — and we do not think that it is — we note that NAACP involved what amounted to an as-applied challenge based on a developed record. There, the plaintiffs had made an "uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of physical hostility." Id. at 462. This stands in sharp contradistinction to the case at hand

— a case in which the appellants have made no faintly comparable showing.

That ends this aspect of the matter. Equating the production order invalidated in NAACP with the disclosure requirements of the Act is like equating aardvarks with alligators. Consequently, we reject the appellants' attempt to place this case under the carapace of NAACP.

By a similar token, there is no parallel between the Act's narrowly tailored disclosure regime, focused on election-related spending, and the general donor-disclosure requirements struck down in Americans for Prosperity (a decision that traced its reasoning back to NAACP). See Ams. for Prosp., 141 S. Ct. at 2382. In Americans for Prosperity, the government's asserted interest was to prevent the mismanagement of charitable contributions. See id. at 2385-86. The Court focused on "the dramatic mismatch" between this asserted interest and an overbroad disclosure regime, striking down the challenged provisions because the information collected played little to no part in assisting the government's anti-fraud efforts. See id. at 2386. That reasoning does not assist the appellants, given that the fit between the Act and the state's informational interest is reasonable.

3

The appellants' third counter-argument attempts to characterize the Act's on-ad disclaimer requirement as a form of unconstitutionally compelled speech. They say that forcing an organization to identify itself and its five largest donors in a disclaimer on certain types of electioneering communications violates their First Amendment right to refrain from expressing particular viewpoints. See Wooley v. Maynard, 430 U.S. 705, 714 (1977) (holding that First Amendment protects "both the right to speak freely and the right to refrain from speaking at all").

In support, the appellants rely on the Supreme Court's decision in National Institute of Family and Life Advocates v. Becerra (NIFLA), 138 S. Ct. 2361 (2018). There, a group of pro-life pregnancy centers challenged a state statute requiring such facilities both to advise women that California provides free or low-cost abortions and to furnish a telephone number that could be called. See id. at 2368. The Court determined that the California statute was content-based because it commanded the centers to "speak a particular message." Id. at 2371. In that regard, the Court emphasized that the statute required pregnancy centers to communicate information about abortion accessibility, which is "the very practice that [the centers] are devoted to opposing." Id. In those circumstances, the Court found that the statute

likely abridged the centers' First Amendment rights.  See id. at 2378.

The appellants assert that the Act's on-ad disclaimer requirement is equally vulnerable because it compels a covered organization to recite a "government-drafted script," id., when announcing itself and its five largest donors.  The appellants submit that because they are organizations that value privacy, such a compelled disclosure is fairly analogous to the mandatory abortion announcement considered in NIFLA.

On-ad disclaimer regimes concerning funding sources in election-related contexts are simply not comparable to requiring pro-life clinics to explain to patients that they may seek free abortion services from the government.  Disclaimers — in the unique election-related context — serve the salutary purpose of helping the public to understand where "money comes from."  Buckley, 424 U.S. at 66.  The election-related context implicated here is alone sufficient to distinguish NIFLA.

Other facets of the attempted comparison underscore the infirmity of the appellants' position.  The on-ad disclaimer requirement burdens speech modestly and does not require any organization to convey a message antithetic to its own principles. The speaker can for the most part control the content of any particular communication and must disclose only some of the funding sources undergirding that communication.  This arrangement imposes

- 36 -

no obligation to annunciate something inimical either to the message of the communication itself or to the fundamental beliefs of the speaker.  So viewed, the appellants' attempt to analogize this challenge to other compelled speech cases poses no obstacle here, and we hold that the challenged provision of the Act does not unconstitutionally require compelled speech.

## IV

Mindful that a well-informed electorate is as vital to the survival of a democracy as air is to the survival of human life, we hold that the challenged provisions of the Act bear a substantial relation to a sufficiently important governmental interest and are narrowly tailored enough to withstand exacting scrutiny.  We also hold that those provisions overcome the appellants' facial challenge and their array of counter-arguments.

We need go no further.  For the reasons elucidated above, we uphold the challenged aspects of Rhode Island's disclosure and disclaimer regime.  Accordingly, the district court's entry of judgment in favor of the Board must be

**<u>Affirmed</u>**.